[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought in two counts by Joseph Lombardo, a resident of Wethersfield, Connecticut. The defendant is Saybrook Marine Services, Inc. a Marina located in Old Saybrook Connecticut. In the first count of his amended complaint the plaintiff alleges a breach of a bailment contract. He alleges that in early 1996 he and the defendant entered into an oral agreement under which the defendant was to provide a boat slip at its marina in Old Saybrook,. Connecticut where the plaintiff's boat a 26 foot MacKenzi Bass Boat, was to be kept for the 1996 season. Under the terms of the Bailment Agreement the plaintiff delivered the boat to the defendant in return for an agreed upon price of $1,200.00.
The plaintiff alleges that the boat was in good structural condition and seaworthy at the time the parties entered into the Bailment Agreement, that the defendant damaged the plaintiff's boat while said boat was in its possession and control by improperly moving it using a forklift which was not the proper equipment to move the vessel and in failing to properly block the plaintiff's boat in the boatyard and in failing to perform the movement of the boat in a good and workmanlike manner. The plaintiff claims that as a result of the defendant's actions he has suffered damages including incidental and consequential damages.
In his second count the plaintiff alleges negligence in that in July of 1996 the defendant negligently and carelessly damaged the plaintiff's boat while said boat was in the possession and control of the defendant under the bailment agreement by improperly removing the boat; by failing to properly block the boat and by failing to perform the movement of the boat in a good and workmanlike manner.
The defendant has denied the principal allegations of the plaintiff's amended complaint and has entered a counterclaim alleging that the plaintiff's claims are knowingly false and CT Page 9000 frivolous.
At the trial on March 9, 1999 the plaintiff presented two witnesses, himself and an expert witness by the name of Richard A. Fewtrell. The defendant presented only one witness, an expert witness by the name of Edward F. McClave.
In arriving at its conclusions in this case the court examined in detail a complete transcript of the record of the trial and all of the exhibits submitted consisting of eleven exhibits submitted by the plaintiff and thirty-three exhibits submitted by the defendant. Of the thirty-three one was a report by the expert witness with thirty-one detailed closeup color photographs of the boat in question. The boat is a 1957 MacKenzi Bass Boat. It is a forty-year old wooden boat built specifically for bass fishing in the rips and along the shoals of rocky areas.
The plaintiff testified that on or about March 30, 1996 he had the boat delivered by Watermark Marine of Niantic, Connecticut to the Saybrook Marine Services. He presented an invoice from this company for $254.40 which states that the boat was inspected by the driver and plaintiff prior to its movement and after delivery and that after blocking, all planking and ribs were sound and in place. He stated that he used this particular company because they had an air ride trailer which would prevent shocks on the road. This invoice indicates that in the initial inspection prior to movement "all planking and ribs sound and in place with the exception of a port rib approximately one foot aft of the forward bulkhead cracked and repaired with glue and screws." The plaintiff testified that after the delivery of the boat it was "in good shape". He showed two photographs of the boat in 1995 and again stated that the boat was "in very good condition".
Mr. Lombardo bought the boat in 1990 or 1991. He stated that his primary hobby was the use and maintenance of this boat. Prior to the delivery he had repainted it, refastened a few planks at the top of the transom with penetrating epoxy that seals the wood and takes out any moisture in the wood. It was of course an old boat by the time he purchased it and he admitted that he had done quite a bit of work on it since he purchased it. He stated that he put in ten planks in the bottom of the boat. He said he removed every butt block in the boat and refastened it. These are where two planks come together between the frames. He removed every rivet from the boat and replaced it with silicone nuts and CT Page 9001 bolts and recaulked the boat. He also stated "I took the point of the bow and I opened it up with all the planks that go under the water." He said he cleaned out the stem and sanded the inside of each plank, filled all the holes and cracks with epoxy forced into all the screw holes. He stated that when you do that the plank becomes as good as new. You could then drill a hole and refasten three screws instead of five and he did that in the bow and the stern. He admitted that he was not a professional but that he had done a lot of work on boats, particularly wooden boats. In addition to this work on the hull he had replaced the cockpit floor and rebuilt the windshield. The boat had an eighteen inch swim platform at the stern.
Plaintiff discovered that the boat had been moved from where it was deposited when delivered and that this move took place with a forklift. Mr. Lombardo said that he was told by the yardman at the Saybrook Marine that the boat was moved by a forklift and that he had three people in the boat listening for cracks and creaking as he lifted the boat up. He also stated that the yard is bumpy and the forklift has solid tires on it and that the boat was moved about three hundred feet.
The boat was moved a second time with Mr. Lombardo present. This was for the purpose of putting it in the water. He stated that he was convinced by the yard man that it had to be moved by the forklift. He testified:
 He comes right in behind the boat. The forks are at an angle like this. I am outside, he is on the forklift. Then he says to me, you ready? I says yeah, go ahead. Then he starts — proceeds to lift the boat with the points of the fork. And I was looking at some friends of mine and I turned around, and I thought I was seeing things. I almost passed out. The whole bottom was stove in, the front was up. I started screaming at him, and he dropped the boat down.
He stated that the operator let the boat down too fast and that it banged on the blocks; that it was about a foot and a half high when it was dropped. He further stated that the yard man told him that what he saw was foam pads on the forks which bends when you lift it up. They then proceeded to put the boat in the water. This all took place more than three weeks after the boat was delivered.
When placed in the water the boat leaked. It stayed in the CT Page 9002 water for six days with pumps running. He had three pumps on the boat. Mr. Lombardo claimed that the boat didn't leak before because before he brought the boat down he sprayed the inside of the boat with water to swell the planks up and that he let some stay in the forward end of the boat and that he did this for two to two and one half weeks every night.
Eventually the boat was removed from the slip with a travel lift which is a hydraulic device with straps rather than a forklift. When the boat was removed Mr. Lombardo maintained that the travel lift used only two straps when it should have used more and that they were placed too far forward. He told them to pick a spot where it was going to stay and that he didn't want the boat moved anywhere.
Mr. Lombardo claimed that he showed the owner of the defendant company that there were two planks that were cracked and that he, the owner, said I can fix those. Mr. Lombardo then suggested that he give it to his insurance company because there was more work than that; the front plank on the bottom was popped out; the knee on the stem was damaged; the bolts were broken when it dropped and the boat had to be refastened again. The owner did not want to do that. No agreement was reached. Thereafter the boat remained where it was in the marina and they were told not to move it. The boat was never returned to the slip and the slip was eventually rented out to someone else.
The plaintiff maintained that he asked for his money back for the slip and he was told that he would be given the money back for the slip if he would forget damages.
Although the plaintiff says he had indicated that the boat was not to be moved again, that it was supposed to say right where it was left, it was in fact moved again in 1996.
Thereafter the plaintiff covered the boat with a forty foot canvas. About a month or so after he covered it, the boat was moved and the canvass was gone and the lines were gone and the antenna was snapped off. The boat was moved by means of a hydraulic trailer. He knew that it was moved by a hydraulic trailer because the yard put it in the storage bill that was sent to him. The plaintiff maintains that when the boat was moved on the line for storage after they took it out of the water subsequent to all the moving and the dropping, the shaft had dropped down and one couldn't turn the shaft and the prop CT Page 9003 indicating that probably the horn timber was damaged because that is what holds up the shaft. He also claims that when they put the boat over in back for storage they jacked up the stern of the boat excessively trying to get the shaft off the block so they could turn the prop and when they did that they cracked the transom. He said every line on the transom was cracked and it had been glued and stayed for six years that way. In addition he maintained that certain equipment was missing from the boat: three batteries, all the wires that went with the batteries and the switch, three bilge pumps, another pump from his live well, the compass, the depth sounder, a couple of gauges, the total damage being about $1,550.00.
The plaintiff hired Mr. Richard Fewtrell to provide him with an estimate for the cost of repair of this boat. Mr. Fewtrell provided him with an estimate in July of 1996 and then later in February of 1997 some supplemental information re: deck repair and painting. The total cost of the repairs according to the estimate of Mr. Fewtrell was $17,460.00. When asked if the repairs were done pursuant to the estimate, what the value of the boat would be in 1996 when the damage was done, Mr. Lombardo expressed the opinion that an honest price would be $20,000.00.
In addition to his claim for damages to the boat the plaintiff is claiming $5,000.00 a year for lack of the use of the boat. The plaintiff testified that he bought the boat for $4,000.00 and sold it without the repairs in October of 1998 for $3,500.00.
The plaintiff's expert Mr. Fewtrell is a shipright with no formal training but approximately 35 years of experience in the repair of wooden boats. He has had experience with boats similar to Mr. Lombardo's and he provided the court with Exhibit 5, a handwritten estimate which was made as a result of his examination on or about July 11, 1996. In this report he states:
 "Gringo" is a forty year old boat in generally good condition for her age. She is clean and well maintained and repairs over the years have been appropriate. Inspection of the bottom indicates the need to replace the four foot knee along with approximately three planks per side. Two of these planks are under the engine, next to the garboard, and it appears these planks have been burst upward by some unfair pressure. Plank land fastening[1] in way of the engine room is generally loose and floors and frames in this area will need repair or CT Page 9004 sistering.
 The horn timber is hogged and this is in the strut skeg. The shaft strut had been forced out of alignment and will need attention. This may involve the replacement of the horn timber. Other repairs were discussed including replacement of at least one topside plank midship to port (left side of boat).
When asked what are the characteristics of a forty year old boat he replied:
 All forty-year-old wood boats that have not been extensively repaired, that is, extensively rebuilt . . . all boats of this nature need rebuilding entirely after that forty years, sometimes earlier, so that all boats of this nature require care. They show certain degradation and they require care to use.
With respect to the expression "unfair pressure underneath", Mr. Fewtrell went to considerable trouble to describe a forklift with twelve foot long forks[2] and expressed the opinion that the majority of the engine weight would be somewhat in the middle or center of the boat which is away from the forklift, "It's at the tips, less than one third of the length of the boat," he said. He speculated that with the five hundred pound engine the boat would have a tendency to fall off the forward end of the forks but that in his opinion the three men who were in the boat when Mr. Lombardo observed it being lifted were probably there as counterweights to hold the boat on the forks. He discussed in considerable detail why he did not recommend that wooden boats be lifted with a forklift. Mr. Fewtrell indicated his opinion that if the repairs had been completed the boat could possibly have been sold for $20,000.00. Mr. Fewtrell, however, had had no prior experience in valuing boats. He indicated that he had made an estimate for repairs and replacing planking at the bottom and various structure repairs. But as indicated in his notations, he would need a formal survey if they were to arrive at a proper estimate. Mr. Fewtrell admitted that the boat had been extensively repaired many times before it was lifted with a forklift and he admitted that not all of the work that he observed was of good quality.
The defendant's sole witness was Mr. Edward F. McClave. Mr. McClave is a professional boat builder who repairs boats. He has a bachelor's degree in mechanical engineering from Rensellear CT Page 9005 Polytechnic and a master's degree in ocean engineering from the University of Rhode Island. In addition to boat building and repairing, he has been doing boat surveying since the mid 1970's. He surveys wooden boats only. He was a member of the committee that revised the Coast Guard's inspection guidelines for wooden vessels in 1994 and he had been involved in research projects with the Coast Guard Research and Development Center on wooden boat inspection techniques, i.e. on the use of non-destructive testing methods to evaluate the condition of wooden vessels. He inspected the boat in question in this case in December of 1997. He submitted a report which is Exhibit GG and 31 individual closeup color photographs of various portions of the McKenzie in question.
In the opinion of this court the testimony of Mr. McClave was decisive of this case. First, there was nothing inconsistent in the testimony of Mr. Fewtrell and of Mr. McClave as to the condition of the boat. Mr. Fewtrell examined the boat from the point of view of giving an estimate as to the cost of repairing damage which he found in the boat and all of the damage that he found was verified by Mr. McClave. Mr. McClave on the other hand, was retained purely to give a survey of the condition of the boat at the time he saw it which was eighteen months after the incidents referred to by Mr. Lombardo. Both Mr. Fewtrell and Mr. McClave agreed that lifting an old wooden boat by forklift was not a desirable practice. The only difference is that Mr. Fewtrell accepted Mr. Lombardo's version of the incident with the forklift and was of the opinion that the damage to the stem was due to the boat being bumped on the ground after the forklift was lowered and he assumed that the cracked planks near the engine was due to pressure from the forklift.
Without going into every detail, Mr. McClave, in the opinion of the court, showed conclusively that there was no damage to this boat caused by the forklift. It was a forty year old wooden boat that had been repaired many, many times, often poorly and that the damage which Mr. Fewtrell assumed might have happened to the boat because of the forklift incident was old damage that preceded that incident. For example, with respect to the stem, Mr. McClave indicated that it was coming apart, not broken, and had been coming apart for a substantial period of time; also that there was no evidence of any external damage with respect to the planks under the engine. He pointed out that all of the planks had splits at the plank laps (where the planks overlap each other); that in many parts of the boat these had been repaired by CT Page 9006 additional blocks; but that under the engine they did not have any additional blocks fastened probably because that area was inaccessible. He also testified that the splits had lead paint and debris in them indicating that they had happened at least before the last time somebody put paint in there. He showed that the condition of the planks in that area was essentially the same as it was over most of the rest of the bottom and he backed up all of his testimony by the detailed color closeup photographs of the areas that he was talking about. Among other things he referred to the use of the "slick seam" soft sealant used as a temporary measure indicating that it is typically used in boat yards on leaky boats to get them through the swell-up period in the spring until they swell and tighten up. There was slick seam on virtually all of the plank lap corners on the outside of the bottom of the boat. He said he would not consider it a repair but a temporary measure to allow the boat to float when it wouldn't otherwise float. Mr. McClave indicated that the splitting of the plank laps was over the whole bottom and that it was a serious problem that would have prevented virtually any method of keeping the plank laps tight and that they had paint, oil and debris in them and it was very unlikely that they were recent. That is, dating from the date the boat was launched in Saybrook.
With respect to the hogging of the boat he agreed with Mr. Fewtrell in his description, that hogging is a condition where the ends droop relative to the middle due to poor storage. In this boat he indicated however, the hogging was at the stern which had drooped relative to the rest of the boat and that this hogging would have no connection at all with the boat being picked up with a forklift which he stated had about 16 foot forks. With reference to the horn timber which is the extension of the keel to which the strut which holds the shaft is attached, he indicated that it did not come from any handling of the boat by the forklift. In his opinion this boat was "in pretty rough shape" not from its being handled with a forklift but because of the normal effects of aging; the use that it has been put through; the way it has been stored over the years; possibly some traumatic incidents in its past which would be evidenced by the stem coming apart. In answer to a question as to his opinion on the total deterioration of the boat or the condition of the boat, whether it was from being handled by a forklift, his answer was:
 When I looked at the boat, the deterioration that I saw was all what I would term long term deterioration. I did not see anything that could be directly attributed to handling by the CT Page 9007 forklift. And I looked for it. One of the things I looked for in addition to what I saw inside of planks being split was some evidence of concentrated load being placed on the outside which might have crushed a plank. One of the obvious things that could have been possible was what was brought up this morning; if the forklift approached the boat and the tips of the forks actually went up into hull. That could have happened. It's possible. However, there would have been some evidence on the outside of the hull of that happening, and I specifically looked for areas of crushed planking on the outside which would indicate a localized load being placed on the boat. And I didn't see it. And of the deterioration I saw on the inside, the split planks, that all appeared to be contemporaneous and to date to some time in the past because the splits were full of debris and things like that. I didn't see anything that looked like new damage.
Further, he indicated the kind of deformation seen on this boat was long term deformation.
 I didn't see anything that would indicate that something broke. And boats don't bend after a ten minute incident or a half an hour incident. Boats break as a result of things like that if the load is enough. They bend as a result of long term inbalances, long term stresses, long term inadequate support . . .
On cross-examination in answer to a question about the boat being subjected to patching his answer was that this boat has an excessive number of patches. Again on cross-examination and in reply to a question about the boat being inspected after transport and being in good condition, his answer was:
 The condition that I saw the boat in, the boat didn't get that way in a few months. Most of the repairs, the slap-dash repairs that had been done, had been done years ago. There is no way that a competent person could possibly have said that that boat was in good condition two years before I saw it because all of those repairs had been done longer ago than that.
He also mentioned that the stem had paint in the joint, that the joint had come apart and had been painted, that the paint had gone into the joint, that it didn't come apart a year before he saw it and that it happened a long time ago. CT Page 9008
During the cross-examination of Mr. McClave he was asked if he was provided any information that the owner of the marina had made an offer to repair the damage caused to the boat as a result of picking it up with a forklift. The answer to this was no. This was the second time there had been a reference to such an offer. The first was on the direct examination of Mr. Lombardo. It would appear that the plaintiff viewed this as some indication by the defendant of an admission of liability. There was no admission of liability by the defendant here or in the conduct of this case. Generally the owner of a marina has the ability to repair damage to the boat. If the plaintiff felt that the boat needed repair, the defendant probably indicated that he could do it as well as anybody else. The plaintiff made it obvious that he wanted a considerable amount of work done in the hope of collecting from the Marina's insurance company but the owner refused.
It is the opinion of this court that this was a forty year old boat in deteriorated condition that had been kept alive by patchwork and by the use of slick seal. It leaked more than an average wooden boat would when placed in the water. Whether after six days it would have tightened up and been usable for another season is questionable or whether it would have been necessary to haul it out and apply more slick seal.
Even though plaintiff now claims that the boat was damaged by being improperly lifted and then dropped, he still had it put in the water. He had friends present when the alleged damage occurred but none were called upon to testify. When he sought an estimate from Mr. Fewtrell it was really for a restoration[3]
of the boat not just repairs to recent damage.
It appears to the court that when the boat didn't swell as rapidly as expected the plaintiff saw three choices: 1. Let it sit longer to see if it would eventually seal itself. 2. Haul it and apply more slick seal.[4] 3. Use the moving by forklift to get it restored at the expense of the Marina's insurance company either with the collusion of the marina owner who, of course, refused or through the court.
In the opinion of the court the testimony of Mr. McClave together with the detailed photographs submitted by him taken with the inconsistencies of the plaintiff's testimony prove conclusively that there was no damage done to this boat by the use of the forklift as alleged by the plaintiff. Judgment may CT Page 9009 enter for the defendant on the complaint and on the counterclaim.
Hale, J.